**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JASON GOLDSTEIN, LYNN MINCK**,** and MICHELLE STURGIS, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>LINDT & SPRÜNGLI (USA), INC.,<br><br>        Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Jason Goldstein, Lynn Minck, and Michelle Sturgis (hereinafter "Plaintiffs"), individually and on behalf of themselves and all others similarly situated, bring this class action lawsuit against Defendant Lindt & Sprüngli (USA), Inc. ("Lindt" or "Defendant") based upon personal knowledge as to themselves, the investigation of their counsel, and on information and belief as to all other matters.

## NATURE OF THE ACTION

1.      This is a class action lawsuit against Defendant regarding the manufacture, distribution, and sale of its Lindt Excellence 70% Cocoa Dark Chocolate Bars and Lindt Excellence 85% Cocoa Extra Dark Chocolate Bar products (collectively the "Affected Products") which contain unsafe levels of lead and cadmium (collectively, "Heavy Metals"). The marketing for and labeling of the Affected Products are silent as to the presence of elevated levels of Heavy Metals in the Affected Products. Lindt's advertising and packaging are false, misleading, and reasonably likely to deceive the public.

2.      Lead is a harmful chemical when consumed and is especially dangerous to pregnant women and children.  Lead poisoning occurs when lead builds up in the body, over months or years.[1]

3.      Any amount of lead exposure can lead to serious health problems.  Children younger than 6 years are especially vulnerable to even mild lead exposure, which can severely affect mental and physical development.[2]  At very high levels, lead poisoning can be fatal in adults and children.[3]

4.      Cadmium is also dangerous when consumed. Cadmium can be found in cigarette smoke and a wide variety of industrial products, including batteries, pigments, metal coatings, and plastics. Cadmium is carcinogenic and exposure to even low levels of cadmium over time may result in a toxic build-up of cadmium in the kidneys, leading to kidney disease[4] and bones damage and osteoporosis.[5]

5.      A December 2022 report by Consumer Reports revealed that a selection of dark chocolate bars sold to the public, including the Affected Products, contained high levels of heavy metals: specifically, cadmium and lead.[6]

6.      Lindt claims and promotes to customers that its "premium chocolate products are safe, as well as delightful."  As a part of its "commitment to food safety," Lindt claims that:

> Our standards uphold the integrity of our raw and packaging materials and ingredients, as well as warehousing, transportation, and manufacturing processes. They help [Lindt] manage key quality and food safety risks across [its] value chain, from farmer to final consumer, while staying ahead of regulatory requirements.

---

[1]  *Lead poisoning*, MAYO CLINIC,  https://www.mayoclinic.org/diseases-conditions/lead-poisoning/symptoms-causes/syc-20354717 (last visited February 13, 2023).
[2]  *Id.*
[3]  *Id.*
[4]  Nikhil Johri, *Heavy Metal Poisoning: The Effects of Cadmium on the Kidney*, BIOMETALS (Oct. 2010) https://pubmed.ncbi.nlm.nih.gov/20354761/ (last visited February 13, 2023).
[5]  Agneta Akesson, *Cadmium-Induced Effects on Bone Population-Based Study of Women*, ENVIRON HEALTH PROJECT (June 2006) https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1480481/ (last visited February 13, 2023).
[6]  Kevin Loria, *Lead and Cadmium Could Be in Your Dark Chocolate*, CONSUMER REPORTS (Dec. 15, 2022) https://www.consumerreports.org/health/food-safety/lead-and-cadmium-in-dark-chocolate-a8480295550/          (last visited February 13, 2023).

[Lindt] aim[s] to achieve full and continuous compliance with quality and food safety standards."[7]

To accomplish this process, Lindt's "International Operations team oversees product quality and product safety, while quality assurance teams at each of its subsidiaries provide oversight at their local production facilities."[8]

7. Lindt notes that its production facilities have certified management systems in place for food safety and follow strict requirement "which **meet or exceed legal regulations and standards** . . . ."[9]

8. In November of 1986, California passed the Safe Drinking Water and Toxic Enforcement Act, which came to be known by its legislative name "Prop 65." Proposition 65 requires businesses to provide warnings to Californians about significant exposures to chemicals that cause cancer, birth defects or other reproductive harm.[10] As a part of that standard, California's experts set regulatory standards for acceptable levels of exposure to toxic chemicals, referred to as the maximum allowable dose levels ("MADLs") in chemicals which are identified as causing cancer, birth defects, or reproductive harm.[11]

9. Consumer Reports referenced California's MADLs for lead (0.5 Micrograms) and cadmium (4.1mcg). The testing performed found that Lindt's Excellence Dark Chocolate 70% cocoa bar product contained 116% of the MADL of cadmium and that Lindt's Excellence Dark Chocolate 85% cocoa bar product contained 166% of the MADL of lead.[12]

---

[7]    *Sustainability and Responsibility: Quality*, LINDT & SPRÜNGLI, https://www.lindt-spruengli.com/amfile/file/download/id/6775/file/Lindt-Spruengli-Sustainability-Report-2021.pdf (last visited February 13, 2023).
[8] *Id.*
[9] *Id.*
[10]    *About Proposition 65*, OFFICE OF ENVIRONMENTAL HEALTH HAZARD ASSESSMENT, https://oehha.ca.gov/proposition-65/about-proposition-65 (last visited February 13, 2023).
[11] *The mysterious world of Prop 65, part 8: Acceptable risk levels*, CONSUMER PRODUCTS LAW BLOG (Feb. 19, 2015) https://www.consumerproductslawblog.com/2015/02/the-mysterious-world-of-prop-65-part-8-acceptable-risk-levels/ (last visited February 13, 2023).
[12] *Id.*

10.     Defendant knew or should have known that its representations and advertisements regarding the Affected Products were false and misleading and that they failed to disclose material information.  Defendant had been notified by previous cadmium exposure notice in 2014 raised by watchdog group As You Sow, which filed Proposition 65 Notices for elevated lead and cadmium levels found in the products of multiple dark chocolate brands, including Lindt.[13]

11.     Consumers could not have known about the unsafe levels of lead and cadmium in the Affected Products before purchasing them without having conducted extensive and expensive scientific testing. Defendant, on the other hand, is positioned to test its products and has exclusive knowledge of the quality control testing on the Affected Products and the ingredients contained therein.

12.     If Plaintiffs knew that the Affected Products contained the Heavy Metals, they would not have purchased the Affected Products on the same terms, if at all.

13.     Plaintiffs and those similarly situated purchasers ("Class Members") relied on Defendant's misrepresentations and omissions that the Affected Products contained only those ingredients listed on the packaging and labeling of the Affected Products.

14.     Plaintiffs and Class Members paid a premium for the Affected Products based upon Defendant's marketing and advertising campaign. Given that Plaintiffs and Class Members paid a premium for the Affected Products based on Defendant's misrepresentations and omissions, Plaintiffs and Class Members suffered an injury in the amount of the premium paid.

15.     Defendant's conduct violated and continues to violate New York's General Business Law §§ 349-350, Florida's Deceptive and Unfair Trade Practices Act, §§ 501.201 *et seq.* and the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*

---

[13] See Ellison Folk, *Notice of Violation of California Health and Safety Code § 25249.5 et seq.*, OFFICE OF THE ATTORNEY GENERAL – STATE OF CALIFORNIA DEPARTMENT OF JUSTICE (Jul.18, 2014) https://oag.ca.gov/system/files/prop65/notices/2014-00635.pdf (last visited February 13, 2023).

Defendant also breached and continues to breach its warranties regarding the Affected Products and has been and continues to be unjustly enriched. Accordingly, Plaintiffs bring this action against Defendant on behalf of themselves and Class Members who purchased the Affected Products during the applicable statute of limitations period (the "Class Period").

## JURISDICTION AND VENUE

16.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 Class members; the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs; and at least one Class member is a citizen of a state different from the Defendant.

17.    This Court has personal jurisdiction over Defendant because Defendant is incorporated in the state of New York, regularly conducts business in this District, and has extensive contacts with this forum.

18.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant is incorporated in this District and a substantial part of Defendant's conduct giving rise to Plaintiffs' claims occurred in this District.

## PARTIES

19.    Plaintiff Jason Goldstein is a resident of the state of Florida. Plaintiff Goldstein purchased the Affected Products, including Lindt's Excellence Dark Chocolate 70% and Lindt's Excellence Dark Chocolate 85%, during the Class Period from a Florida retailer. Prior to purchasing the Affected Products, Plaintiff Goldstein read the Affected Products' labels and purchased the Affected Products in reliance on Defendant's representation that the Affected Products contained only the ingredients listed on the Affected Products' packaging and were safe for consumption. Plaintiff Goldstein believed that the Affected Products that were advertised as dark chocolate did not contain lead and cadmium.  If Lindt remedied the issues identified in this complaint, Plaintiff Goldstein would resume purchasing the Affected Products.

20.    Plaintiff Lynn Minck is a resident of the state of New York. Plaintiff Minck purchased the Affected Products, including Lindt's Excellence Dark Chocolate 85%, during the Class Period from a retailer in New York. Prior to purchasing the Affected Products, Plaintiff Minck read the Affected Products' labels and purchased the Affected Products in reliance on Defendant's representation that the Affected Products contained only the ingredients listed on the Affected Products' packaging and were safe for consumption. Plaintiff Minck believed that the Affected Products that were advertised as dark chocolate did not contain lead and cadmium.  If Lindt remedied the issues identified in this complaint, Plaintiff Minck would resume purchasing the Affected Products.

21.    Plaintiff Michelle Sturgis is a resident of the state of Illinois. Since about 2015, Plaintiff Sturgis has purchased the Affected Products approximately two times per month from retail stores including Walgreens, Target, Walmart, and Mariano's located in Joliet and Shorewood, Illinois.  Prior to purchasing the Affected Products, Plaintiff Sturgis read the Affected Products' labels and purchased the Affected Products in reliance on Defendant's representation that the Affected Products contained only the ingredients listed on the Affected Products' packaging and were safe for consumption. Plaintiff Sturgis believed that the Affected Products that were advertised as dark chocolate did not contain lead and cadmium.  If Lindt remedied the issues identified in this complaint, Plaintiff Sturgis would resume purchasing the Affected Products.

22.    Defendant Lindt & Sprüngli (USA), Inc. is incorporated in the state of New York. It is headquartered in Stratham, New Hampshire.  As part of its broader business, Defendant manufactures, advertises, labels, and sells dark chocolate, including the Affected Products, throughout the United States. Defendant created or authorized the creation and dissemination of the deceptive advertisements, packaging, and labeling associated with the Affected Products.

## FACTUAL ALLEGATIONS

23.    Consumers must and do rely on Defendant to truthfully and honestly report what their Affected Products contain on their packaging or labels.  Companies, including Lindt as alleged herein, profit from consumers' search for safe and healthy products.  Consumers will, and do, pay premiums for safe and healthy products.

24.    While the advertising and marketing for the Affected Products is silent as to the levels of cadmium and lead present in the Affected Products, public reports and articles recently revealed that Defendant's Affected Products contain unsafe levels of lead and cadmium. The levels of lead and cadmium observed exceeded the MADLs for these chemicals posing serious health risks.

25.    Lead and cadmium, which are both present in the Affected Products, are heavy metals and their presence in food, alone or combined, poses a serious safety risk to consumers because they can cause cancer and other serious problems (often irreversible) such as damage to brain development, the liver, kidneys, and bones.[14]

26.    California recognized that lead and cadmium as "known to the state to cause cancer or reproductive toxicity . . ." after the state's qualified experts formed the opinion that both lead[15] and cadmium[16] were "shown through scientifically valid testing according to generally accepted principles to cause cancer or reproductive toxicity."[17]

27.    The harmful effects of lead have been studied extensively, particularly its effect on children.  Studies have shown that even lower levels of lead exposure in children may result in

---

[14] *Heavy metals in food crops: Health risks, fate, mechanisms, and management*, SCIENCEDIRECT, https://www.sciencedirect.com/science/article/pii/S0160412018327971 (last visited February 132023).

[15] *Lead and Lead Compounds*, CALIFORNIA OFFICE OF ENVIRONMENTAL HEALTH HAZARD ASSESSMENT, https://oehha.ca.gov/proposition-65/chemicals/lead-and-lead-compounds (last visited February 13, 2023).

[16] Cadmium, CALIFORNIA OFFICE OF ENVIRONMENTAL HEALTH HAZARD ASSESSMENT, https://oehha.ca.gov/proposition-65/chemicals/cadmium (last visited February 13, 2023).

[17] *See* Cal. Health & Safety Code § 25249.8(b).

reduced neurobehavioral functioning, with symptoms ranging from neuropsychological deficits that interfere with classroom performance, lower IQ, decreased verbal processing and attention span.[18]

28.     Lead can also cross the fetal barrier during pregnancy, exposing the developing fetus and mother to risks in the form of reduced growth and premature birth.[19]

29.     More generally, lead may cause anemia, weakness, and kidney and brain damage.[20] In fact, lead accumulates over time and may affect almost every organ and system in a person's body, leading to toxicity and serious health risks, including inhibited neurological function, anemia, seizures, and, at worst, coma and death.[21]

30.     Adults are also affected by lead toxicity, as the bones can store lead after initial exposure and re-expose the body by releasing the stored lead into the blood stream.[22]

31.     Cadmium, a heavy metal like lead, also poses severe safety concerns for consumers.

32.     Like lead, cadmium may cause complications in pregnant women such as fetal growth restriction.[23]

33.     The World Health Organization classified cadmium as a Group 1 carcinogen in 2012,[24] and its exposure is known to cause a variety of cancers.[25]   The US Center for Disease

---

[18] Theodore I. Lidsky and Jay S. Schneider, *Lead neurotoxicity in children: basic mechanisms and clinical correlates*, BRAIN, Vol. 126, Issue 1 (Jan. 2003) https://academic.oup.com/brain/article/126/1/5/299373#.Y79duQG8eOc.link (last visited February 13, 2023).

[19] See *Childhood Lead Poisoning Prevention: Pregnant Women*, CENTERS FOR DISEASE CONTROL AND PREVENTION, *https://www.cdc.gov/nceh/lead/prevention/pregnant.htm* (last visited February 13, 2023).

[20] *The National Institute for Occupational Safety and Health (NIOSH): Lead*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/niosh/topics/lead/health.html (last visited February 13, 2023).

[21] *Id.*

[22] See *Lead Exposure in Adults: A Guide for Health Care Providers*, STATE OF NEW YORK DEPARTMENT OF HEALTH, https://www.health.ny.gov/publications/2584.pdf  (last visited February 13, 2023).

[23] Hui-Xia Geng et al, *Cadmium: Toxic Effects on Placental And Embryonic Development*, NIH: NATIONAL LIBRARY OF MEDICINE (Feb. 15, 2019) https://pubmed.ncbi.nlm.nih.gov/30797179/ (last visited February 13, 2023)

[24] *IARC Monographs on the Identification of Carcinogenic Hazards to Humans: List of Classifications*, INTERNATIONAL AGENCY FOR RESEARCH ON CANCER – WORLD HEALTH ORGANIZATION, https://monographs.iarc.who.int/list-of-classifications (last visited February 13, 2023).

[25] *Cancer Trends Progress Report: Cadmium*, NATIONAL CANCER INSTITUTE – NIH, https://progressreport.cancer.gov/prevention/cadmium#:~:text=Cadmium%20and%20its%20compounds%20are,the%20breast%20and%20urinary%20bladder. (last visited February 13, 2023).

Control concurs with the World Health Organization and similarly considers cadmium to be "a cancer-causing agent."[26]

34.    When eaten, large amounts of cadmium can severely irritate the stomach and cause vomiting and diarrhea.[27]  Even at low exposure levels, cadmium can build up in the kidneys and cause kidney disease and fragile bones.[28]

35.    Consumers lack the meaningful ability to test or independently discover whether a product contains unhealthy substances such as lead, cadmium, or other unsafe substances, especially at the point of sale. The testing necessary to discover many unhealthy substances, including cadmium and lead, requires expensive and destructive scientific testing. Given the relatively low price of the Affected Products, no reasonable consumer would engage in such testing before purchasing the Affected Products.

36.    Consumers must, instead, rely on Defendant to truthfully represent what its Affected Products contain on its packaging and labels.

37.    However, public reports and articles recently revealed that Defendant's Affected Products contain unsafe levels of lead and cadmium. The levels of lead and cadmium observed exceeded the MADLs for these chemicals; posing serious health risks. Despite these risks, Defendant failed to include any disclosures regarding lead and cadmium levels on its Affected Products.

38.    Defendant knew and/or should have known of the lead and cadmium in the Affected Products. In 2014, Lindt (as well as other manufacturers and distributors) received notice that at least some of its dark chocolate products, including the Lindt Excellence 85% Cocoa Extra Dark

---

[26] *National Biomonitoring Program: Cadmium Factsheet*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/biomonitoring/Cadmium_FactSheet.html (last visited February 13, 2023).
[27] *Id.*
[28] *Id.*

Chocolate Bar, contained excessive cadmium.[29]  This notice came in the form of Proposition 65 Violation Notices which confirmed the presence of heavy metals in the Lindt products, including one of the Affected Products.[30]  In the intervening 8 years, Lindt has not remedied the issue, failing to warn consumers that the Affected Products would expose consumers to cadmium and lead when eaten.

39.    Researchers have found that heavy metals were "typically found naturally in the outer shell of the cocoa bean, not in the bean itself."[31]  The beans were measured soon after being picked and removed from pods, showing low levels of cadmium and lead, but, as the beans dried, the levels increased.[32]  Consumer Reports and its researches concluded that "[d]uring that time, lead-filled dust and dirt accumulated on the beans."[33]  Thus, on information and belief, Lindt itself is responsible for lead being present in the Affected Products.

40.    Additionally, Defendant has a responsibility to implement controls to significantly minimize or prevent unnecessary consumer exposure to the Heavy Metals in the Affected Products. Lindt itself represents it control "the making of its chocolate from the selection of ingredients through production to distribution and sale."[34]  As a part of it controlling "the entire production process," Lindt uses "internal and external quality systems [and] an extensive network of specialists" to ensure its "products meet the highest standards . . . ."[35]  Rather than contract the

---

[29]    *Valentine's Day Chocolates: Any Heavy Metals in There?*, FOODSAFETYNEWS, https://www.foodsafetynews.com/2015/02/valentine-chocolates-any-heavy-metals-in-there/ (last visited February 13, 2023).
[30]    See Ellison Folk, *Notice of Violation of California Health and Safety Code § 25249.5 et seq.*, OFFICE OF THE ATTORNEY GENERAL – STATE OF CALIFORNIA DEPARTMENT OF JUSTICE (Oct. 24, 2017) https://oag.ca.gov/system/files/prop65/notices/2017-02379.pdf (last visited February 13, 2023).
[31]    Kevin Loria, *Lead And Cadmium Could Be In Your Dark Chocolate*, CONSUMER REPORTS (Dec. 15, 2022) https://www.consumerreports.org/health/food-safety/lead-and-cadmium-in-dark-chocolate-a8480295550/ (last visited February 13, 2023).
[32]    *Id.*
[33]    *Id.*
[34]    *Sustainability and Responsibility – 10 Facts*, LINDT & SPRÜNGLI, https://www.lindt-spruengli.com/amfile/file/download/id/6775/file/Lindt-Spruengli-Sustainability-Report-2021.pdf (last visited February 13, 2023).
[35]    *Id.*

testing of raw materials to third-parties, "all raw materials are tested in [Lindt's] in-house laboratories against the **strictest specifications and quality standards** before and after purchase."[36]

41.    Lindt also notes that the safety of its products are "part of our brand identity and a core component of our business model . . . ."[37]  According to Lindt it works with subsidiaries to assess changing safety regulations in order to make any necessary adjustments to its standards.[38] When ingredients it uses are deemed a health risk by new scientific findings, Lindt claims it will "work to quickly remove them from recipes."[39]  Lindt goes on to promise that it is committed to "responsible marketing communications that . . . help consumers make informed choices about their buying and consumption habits[,]" including "nutritional transparency . . . ."[40]

42.    While Defendant tells its customers about its testing practices and transparency for its nutritional information, it does not speak as to how it determines whether or not it complies with its own promise to "**meet or exceed legal regulations and standards** . . . .."[41]

43.    Accordingly, Defendant is in the best position to test the Affected products for lead and cadmium levels.

44.    Despite representing that its products "meet the highest standards," Defendant sells the Affected Products containing unsafe levels of Heavy Metals.

45.    Defendant knew that the Affected Products contain heavy metals, and failed to provide any warning on packaging or labels, that the Affected Products contain, or risk containing, lead and cadmium.

---

[36] *Id.*
[37]    *Sustainability    Report    2021*, LINDT    &    SPRUENGLI, https://www.lindt-spruengli.com/amfile/file/download/id/6775/file/Lindt-Spruengli-Sustainability-Report-2021.pdf    (last    visited February 13, 2023).
[38] *Id.*
[39] *Id.*
[40] *Id.*
[41] *See Id.*

46.    In making their purchasing decisions, consumers, such as Plaintiffs and the Class Members, are influenced by the ingredients listed, as well as any warnings (or lack thereof) on the packaging of food they purchase. If Defendant had not failed to disclose that the Affected Products contained unsafe levels of lead and cadmium and that the Affected Products were not safe for consumption, then Plaintiffs and the Class would not have paid a premium for the Affected Products (or purchased them at all).

47.    Plaintiffs and the Class reasonably relied on the marketing, labeling, and information provided by Defendant in making purchasing decisions. By representing that the Affected Products contain only the ingredients listed on the Affected Products' labeling, and not disclosing the presence of the Heavy Metals, Defendant misled reasonable consumers, including Plaintiffs and the Class.

48.    Defendant's false, misleading, and deceptive misrepresentations and omissions are likely to continue to deceive and mislead reasonable consumers and the general public, as they have already deceived and misled Plaintiffs and the Class Members.

49.    Plaintiffs would not have purchased the Affected Products, or would have paid less for them, had the Affected Products been truthfully and accurately labeled.

## CLASS ALLEGATIONS

50.    Plaintiffs brings their claims for relief pursuant to the Federal Rules of Civil Procedure 23(a), 23(b)(2), or 23(b)(3) on behalf of the following Class (collectively "the Class"):

> All consumers who purchased one or more of the Affected Products in the United States within the applicable limitations period (the "Nationwide Class").

51.    Plaintiff Goldstein brings this class action individually and on behalf of the following Florida subclass:

> All consumers who purchased one or more of the Affected Products in the state of Florida within the applicable limitations period (the "Florida Subclass").

52.     Plaintiff Minck brings this class action individually and on behalf of the following New York subclass:

> All consumers who purchased one or more of the Affected Products in the state of New York within the applicable limitations period (the "New York Subclass").

53.     Plaintiff Sturgis brings this class action individually and on behalf of the following Illinois subclass:

> All consumers who purchased one or more of the Affected Products in the state of Illinois within the applicable limitations period (the "Illinois Subclass").

54.     Excluded from the Class is governmental entities, Defendant, any entity in which Defendant has a controlling interest, and Defendant's officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns, as well as any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

55.     The Nationwide Class, Florida Subclass, New York Subclass, and Illinois Subclass shall be referred to collectively throughout the Complaint as the Class.

56.     The Nationwide Class, Florida Subclass, New York Subclass, and Illinois Subclass are properly brought and should be maintained as class actions under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy because:

57.     Numerosity: Class Members are so numerous that joinder of all members is impracticable. Plaintiffs believe that there are thousands of consumers in the Class who have been damaged by Defendant's deceptive and misleading practices.

58.     Commonality: The questions of law and fact common to the Class Members which predominate over any questions which may affect individual Class Members include, but are not limited to:

> a.     Whether Defendant's marketing, advertising, packing, and labeling for the Affected Products was false, misleading, and/or deceptive;

b.  Whether Defendant is responsible for the conduct alleged herein which was uniformly directed at all consumers who purchased its Affected Products;

c.  Whether the Affected Products contain unsafe levels of lead and cadmium;

d.  Whether Defendant breached the implied warranty of merchantability relating to the Affected Products;

e.  Whether Defendant's misconduct set forth in this Complaint demonstrates that Defendant has engaged in unfair, fraudulent, or unlawful business practices with respect to the advertising, marketing, and sale of the Affected Products;

f.  Whether Defendant's false and misleading statements concerning the Affected Products were likely to deceive the public; and

g.  Whether Plaintiffs and the Class are entitled to money damages under the same causes of action as the other Class Members.

59.  Typicality: Plaintiffs' claims are typical of the claims of the Class because Plaintiffs, like all other Class Members, purchased the Affected Products, suffered damages as a result of that purchase, and seek the same relief as the proposed Class Members.

60.  Adequacy: Plaintiffs adequately represent the Class because their interests do not conflict with the interests of the members of the Class, and they have retained counsel competent and experienced in complex class action and consumer litigation. Plaintiffs and their counsel will fairly and adequately protect the interest of the members of the Class.

61.  Predominance: Pursuant to Rule 23(b)(3), the common issues of law and fact identified above predominate over any other questions affecting only individual members of the Class. The Class issues fully predominate over any individual issue because no inquiry into individual conduct is necessary; all that is required is a narrow focus on Defendant's deceptive and misleading marketing and labeling practices.

62.     Superiority: A class action is superior to other available means of adjudication for this controversy. It would be impracticable for members of the Class to individually litigate their own claims against Defendant because the damages suffered by Plaintiffs and the members of the Class are relatively small compared to the cost of individually litigating their claims. Individual litigation would create the potential for inconsistent judgments and delay and expenses to the court system. A class action provides an efficient means for adjudication with fewer management difficulties and comprehensive supervision by a single court.

63.     Accordingly, this Class is properly brought and should be maintained as a class action under Rule 23(b)(3) because questions of law or fact common to Class Members predominate over any questions affecting only individual members, and because a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

## CAUSES OF ACTION

### COUNT I

**VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349**
**(On Behalf of the Plaintiff Minck, and the New York Subclass Members)**

64.     Plaintiff Minck repeats and re-alleges each and every factual allegation contained in all previous paragraphs as if fully set forth herein.

65.     Plaintiff Minck brings this claim individually and on behalf of the New York Subclass members.

66.     Defendant conducts business and trade, in its sale of goods throughout the State, within the meaning of New York's General Business Law § 349.

67.     Plaintiff Minck and members of the New York Subclass are consumers who purchased the Affected Products for their personal use.

68.    Defendant engaged in deceptive, unfair, and misleading acts and practices, including its failure to disclose that the Affected Products were manufactured in a way that rendered them unsuitable for their intended purpose.

69.    Defendant did not disclose and/or omitted material facts regarding the nature of the Affected Products.

70.    Defendant falsely represented that the Affected Products did not contain the Heavy Metals.

71.    Defendant's actions were directed at consumers.

72.    The foregoing deceptive acts and practices are misleading in a material way because they fundamentally misrepresent the characteristics and quality of the Affected Products to induce consumers to purchase the same.

73.    Defendant's representations and omissions were material because they were likely to deceive reasonable consumers.

74.    Defendant possessed information about the presence of lead and cadmium in its Affected Products, which was relevant to Plaintiff Minck and the New York Subclass members, but failed to disclose this information.

75.    Through this conduct, Defendant engaged in deceptive conduct in violation of New York's General Business Law.

76.    Defendant's actions are the direct, foreseeable, and proximate cause of the damages that Plaintiff Minck and members of the New York Subclass have sustained from having paid for the Affected Products.

77.    As a result of Defendant's violations, Plaintiff Minck and members of the New York Subclass have suffered damages because: (a) they would not have purchased the Affected Products on the same terms, if at all, if they knew that the Affected Products contained the Heavy

Metals; and (b) the Affected Products do not have, and therefore Plaintiff Minck could not enjoy, the characteristics, uses, benefits, or qualities as promised.

78.    On behalf of herself and other members of the New York Subclass, Plaintiff Minck brings this action to enjoin Defendant's unlawful and deceptive acts or practices and seeks to recover actual damages or fifty dollars, whichever is greater, per violation, three times actual damages, and reasonable attorneys' fees.

## COUNT II

### VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 350
### (On Behalf of the Plaintiff Minck and New York Subclass Members)

79.    Plaintiff Minck repeats, re-alleges, and incorporates each and every factual allegation contained in all previous paragraphs as if fully set forth herein.

80.    Plaintiff Minck brings this count on behalf of herself and all members of the New York Subclass that purchased the Affected Products.

81.    New York's General Business Law § 350 prohibits false advertising in the conduct of any business, trade, or commerce.

82.    Pursuant to said statute, false advertising is defined as "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect."

83.    Based on the foregoing, Defendant engaged in consumer-oriented conduct that is deceptive or misleading in a material way which constitutes false advertising in violation of Section 350 of New York's General Business Law.

84.    Defendant's false, misleading, and deceptive representations and omissions of fact about the Affected Products were and are directed towards consumers.

85.    Defendant's false, misleading, and deceptive representations and omissions were material and are likely to mislead a reasonable consumer acting reasonably under the customary or usual circumstances.

86.     Defendant's false, misleading, and deceptive representations and omissions have resulted in consumer injury or harm to the public interest.

87.     As a result of Defendant's false, misleading, and deceptive statements and representations of fact, and omissions, Plaintiff Minck and the New York Subclass have suffered and continue to suffer economic injury.

88.     As a result of Defendant's violations, Plaintiff and members of the New York Subclass have suffered damages because: (a) they would not have purchased the Affected Products on the same terms, if at all, if they knew that the Affected Products contained high levels of Heavy Metals; and (b) the Affected Products do not have, and therefore Plaintiff Minck could not enjoy, the characteristics, uses, benefits, or qualities as promised.

89.     On behalf of herself and other members of the New York Subclass, Plaintiff Minck seeks to recover actual damages or five hundred dollars, whichever is greater for each violation, three times actual damages, and reasonable attorneys' fees.

## COUNT III

### VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
### Fla. Stat. Ann. §§ 501.201 et seq.
### (On Behalf of Plaintiff Goldstein and the Florida Subclass Members)

90.     Plaintiff Goldstein repeats and re-alleges each and every factual allegation contained in all previous paragraphs as if fully set forth herein.

91.     Plaintiff Goldstein brings this count on behalf of himself and all members of the Florida Subclass that purchased the Affected Products.

92.     The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. Ann. §501.204(1).

93.     Plaintiff Goldstein and the Florida Subclass members are "[c]onsumer[s]" and "[i]nterested part[ies] or person[s]" as defined by the FDUTPA. See Fla. Stat. Ann. §501.203(6)-(7).

94.     Defendant engaged in "[t]rade or commerce" as defined by the FDUTPA. See Fla. Stat. Ann. §501.203(8).

95.     Defendant, directly or through its agents, employees, and/or subsidiaries, violated the FDUTPA by misrepresenting, omitting, concealing, and failing to disclose material facts on the labels for its Affected Products, including that the Affected Products were not fit to be used for their intended purpose because they contained elevated levels of Heavy Metals that rendered them unsafe and unfit for human consumption.

96.     Defendant violated the FDUTPA by misrepresenting, omitting, concealing, and failing to disclose material facts in its marketing, advertising, and promotions for its Affected Products, including that the Affected Products were not fit to be used for their intended purpose because they contained elevated levels of Heavy Metals that rendered them unsafe and unfit for human consumption.

97.     Specifically, by misrepresenting, omitting, concealing, and failing to disclose material facts regarding the Affected Products, as detailed above, Defendant engaged in one or more unfair or deceptive acts or practices in the conduct of trade or commerce, in violation of the FDUTPA.

98.     Defendant's misrepresentations and omissions regarding the inherently defective and unreasonably dangerous nature of the Affected Products were disseminated to Plaintiffs and the Class members in a uniform manner.

99.     Defendant's unfair or deceptive acts or practices, including its misrepresentations, concealments, omissions, and suppressions of material facts, as alleged herein, had a tendency or capacity to mislead and create a false impression in consumers' minds, and were likely to and, in

fact, did deceive reasonable consumers, including Plaintiff Goldstein and the Florida Subclass members, about the unreasonably dangerous nature of the Affected Products.

100.    The facts regarding the Affected Products that Defendant misrepresented, omitted, concealed, and failed to disclose would be considered material by a reasonable consumer, and they were, in fact, material to Plaintiff Goldstein and the Florida Subclass members, who consider such facts to be important to their purchase decisions with respect to the Affected Products.

101.    Plaintiff Goldstein and the Florida Subclass members were aggrieved by Defendant's violations of the FDUTPA because they suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's misrepresentations, omissions, concealments, and failures to disclose material facts as set forth above.

102.    As a result of Defendant's violations, Plaintiff and members of the Florida Subclass have suffered damages because: (a) they would not have purchased the Affected Products on the same terms, if at all, if they knew that the Affected Products contained high levels of Heavy Metals; and (b) the Affected Products do not have, and therefore Plaintiff could not enjoy, the characteristics, uses, benefits, or qualities as promised.

103.    Specifically, Plaintiff Goldstein and the Florida Subclass members were deceived by Defendant's misrepresentations, omissions, concealments, and failures to disclose material facts regarding the Affected Products. Had Defendant not engaged in the deceptive acts and practices alleged herein, Plaintiff Goldstein and the Florida Subclass members would not have purchased the Affected Products, and, thus, they did not receive the benefit of the bargain and/or suffered out-of-pocket loss.

104.    Defendant's violations present a continuing risk to Plaintiff Goldstein and the Florida Subclass members, as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

105.    As a result of Defendant's violations of the FDUTPA, as alleged herein, Plaintiff Goldstein and the Florida Subclass members seek an order enjoining Defendant's unfair or deceptive acts or practices and awarding actual damages, costs, attorneys' fees, and any other just and proper relief available under the FDUTPA.

## COUNT IV

**Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act**
**(On Behalf Plaintiff Sturgis and the Illinois Subclass Members)**

106.    Plaintiff Sturgis brings this count on behalf of herself and the Illinois Subclass and repeats and re-alleges all previous paragraphs, as if fully included herein.

107.    Plaintiff Sturgis and Illinois Subclass members are consumers under the Illinois Consumer Fraud Act and Defendant is a "person" within the meaning of 815 Ill. Comp. Stat. 510/1(5).

108.    Defendant engaged, and continues to engage, in the wrongful conduct alleged herein in the course of trade and commerce, as defined in 815 ILCS 505/2 and 815 ILCS 510/2.

109.    815 ILCS 505/2 (Illinois Consumer Fraud Act) prohibits:

> [u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act,' approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

110.    815 ILCS 510/2 provides that a:

> person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person does any of the following: "(2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or

> services; ... (5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have...; (7) represents that goods or services are of a particular standard, quality, or grade... if they are not; ... [and] (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding."

111.    Defendant's representations and omissions concerning the representations and omissions at issue were false and/or misleading as alleged herein.

112.    Defendant's foregoing deceptive acts and practices, including its omissions, were likely to deceive, and did deceive, consumers acting reasonably under the circumstances. Consumers, including Plaintiff Sturgis and Illinois Subclass Members, would not have purchased the Affected Products had they known the Affected Products contained unsafe levels of Heavy Metals. These claims, alone or in tandem, are false, misleading, and/or deceptive.

113.    Defendant's false or misleading representations and omissions were such that a reasonable consumer would attach importance to them in determining his or her purchasing decision.

114.    Defendant's false and misleading representations and omissions were made to the entire Illinois Subclass.

115.    Defendant knew or should have known their representations and omissions were material and were likely to mislead consumers, including Plaintiff Sturgis and the Illinois Subclass.

116.    Defendant's practices, acts, and course of conduct in marketing and selling the Affected Products were and are likely to mislead a reasonable consumer acting reasonably under the circumstances to his or her detriment.

117.    Defendant profited from the sale of the falsely, deceptively, and unlawfully advertised the Affected Products to unwary consumers.

118.    Defendant's wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the Illinois Consumer Fraud Act.

119.    Defendant's wrongful business practices were a direct and proximate cause of actual harm to Plaintiff Sturgis and to each Illinois Subclass member.

120.    As a direct and proximate result of Defendant's unfair and deceptive trade practices, Plaintiff Sturgis and the Illinois Subclass members have suffered ascertainable loss and actual damages. Plaintiff Sturgis and the Illinois Subclass members who purchased the Affected Products would not have purchased them, or, alternatively, would have paid less for them had the truth about the nonconforming ingredients been disclosed. Plaintiff Sturgis and the Illinois Subclass members did not receive the benefit of their bargain. Plaintiff Sturgis and the other Illinois Subclass members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowed under 815 Ill Comp. Stat. 505/1, *et seq*.

## COUNT V

**BREACH OF IMPLIED WARRANTY**
**(On Behalf of Plaintiffs and All Class Members)**

121.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

122.    Defendant manufactured, marketed, labeled, distributed, and sold the Affected Products, as part of its overall business.

123.    The Affected Products are considered a "good" under the relevant laws.

124.    For goods to be merchantable under UCC section 2-314, it must (a) pass without objection in the trade under the contract description; (b) in the case of fungible goods, are of fair average quality within the description; (c) are fit for the ordinary purposes for which such goods are used; and (d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved.

125.    Defendant breached the implied warranty of merchantability. The Affected Products, meant to be ingested, should not contain unsafe levels of Heavy Metals.

126.    Defendant is on notice of its breach.  In addition to widespread media reports, upon information and belief and based on representations made by Lindt, the Company is or should have been aware through its own product testing and records.  In addition, on January 20, 2023, Plaintiffs Goldstein and Minck served Defendant with a pre-suit notice letter.

127.    The Affected Product contained lead and cadmium, in amounts that were dangerous to be consumed.  Plaintiffs and each of the members of the Class were injured as a result. Defendant thereby breached the following state warranty laws:

a.    Code of Ala. § 7-2-314;

b.    Alaska Stat. § 45.02.314;

c.    A.R.S. § 47-2314;

d.    A.C.A. § 4-2-314;

e.    Cal. Comm. Code § 2314;

f.    Colo. Rev. Stat. § 4-2-314;

g.    Conn. Gen. Stat. § 42a-2-314;

h.    6 Del. C. § 2-314;

i.    D.C. Code § 28:2-314;

j.    Fla. Stat. § 672.314;

k.    O.C.G.A. § 11-2-314;

l.    H.R.S. § 490:2-314;

m.    Idaho Code § 28-2-314;

n.    810 I.L.C.S. 5/2-314;

o.    Ind. Code § 26-1-2-314;

p.    Iowa Code § 554.2314;

q.    K.S.A. § 84-2-314;

r.    K.R.S. § 355.2-313;

s.    11 M.R.S. § 2-314;

t.    Md. Commercial Law Code Ann. § 2-314;

u.    106 Mass. Gen. Laws Ann. § 2-314;

v.    M.C.L.S. § 440.2314;

w.    Minn. Stat. § 336.2-314;

x.    Miss. Code Ann. § 75-2-314;

y.    R.S. Mo. § 400.2-314;

z.    Mont. Code Anno. § 30-2-314;

aa.    Neb. Rev. Stat. § 2-314;

bb.    Nev. Rev. Stat. Ann. § 104.2314;

cc.    R.S.A. 382-A:2-314;

dd.    N.J. Stat. Ann. § 12A:2-314;

ee.    N.M. Stat. Ann. § 55-2-314;

ff.    N.Y. U.C.C. Law § 2-314;

gg.    N.C. Gen. Stat. § 25-2-314;

hh.    N.D. Cent. Code § 41-02-31;

ii.    II. O.R.C. Ann. § 1302.27;

jj.    12A Okl. St. § 2-314;

kk.    Or. Rev. Stat. § 72-3140;

ll.    13 Pa. Rev. Stat. § 72-3140;

mm.    R.I. Gen. Laws § 6A-2-314;

nn.    S.C. Code Ann. § 36-2-314;

oo.    S.D. Codified Laws, § 57A-2-314;

pp.    Tenn. Code Ann. § 47-2-314;

qq.    Tex. Bus. & Com. Code § 2.314;

    rr.    Utah Code Ann. § 70A-2-314;

    ss.    9A V.S.A. § 2-314;

    tt.    Va. Code Ann. § 8.2-314;

    uu.    Wash. Rev. Code Ann. § 6A.2-314;

    vv.    W. Va. Code § 46-2-314;

    ww.    Wis. Stat. § 402.314; and

    xx.    Wyo. Stat. § 34.1-2-314.

128.    As a direct and proximate result of Defendant's breach of the express warranty, Plaintiffs and Class Members were damaged in the amount of the price they paid for the Affected Products.

## COUNT VI

### UNJUST ENRICHMENT
### (On Behalf of Plaintiffs and All Class Members in the Alternative)

129.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

130.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Nationwide class against Defendant.

131.    Plaintiff and members of the Class conferred benefits on Defendant by purchasing the Affected Products.

132.    Defendant has been unjustly enriched in retaining the revenues derived from Plaintiffs' and Class members' purchases of the Affected Products.

133.    Retention of those moneys under these circumstances is unjust and inequitable because Defendant has engaged, and continues to engage, in a systematic campaign of representing that the Affected Products do not contain the Heavy Metals, concealing and omitting material facts regarding the true nature of the Affected Products.  These false representations and omissions

caused injuries to Plaintiffs and members of the Class because they would not have purchased the Affected Products, if at all, if they knew that the Affected Products contained unsafe levels of Heavy Metals.

134.    Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiffs and members of the Class is unjust and inequitable, Defendant must pay restitution to Plaintiffs and members of the Class for its unjust enrichment, as ordered by the Court.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of all other similarly situated, seek judgment against the Defendant as follows:

(a) For an order determining that this action is properly brought as a class action and certifying Plaintiffs as the representatives of the Class and their counsel as Class Counsel;

(b) For an order declaring the Defendant's conduct violates the laws referenced herein;

(c) For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

(d) For damages in amounts to be determined by the Court and/or jury;

(e) An award of statutory damages or penalties to the extent available;

(f) For pre-judgment interest on all amounts awarded;

(g) For an order of restitution and all other forms of monetary relief; and

(h) Such other and further relief as the Court deems necessary and appropriate.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury on all issues so triable.

Dated: February 13, 2023     Respectfully submitted,

            **LEVI & KORSINSKY, LLP**

            By: /s/Mark S. Reich_____
            Mark S. Reich
            Courtney E. Maccarone
            **LEVI & KORSINSKY, LLP**
            55 Broadway, 10th Floor
            New York, NY 10006
            Telephone: (212) 363-7500
            Facsimile: (212) 363-7171
            Email: mreich@zlk.com
            Email: cmaccarone@zlk.com

            *Attorneys for Plaintiff*